UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 18-23-DLB-CJS

UNITED STATES OF AMERICA                                            PLAINTIFF

vs.                    **MEMORANDUM OPINION AND ORDER**

JOHN LEE McCLOUD                                                    DEFENDANT

\*\*\*   \*\*\*   \*\*\*   \*\*\*

I.  INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress all evidence seized from his person at a hotel on February 21, 2018. (Doc. # 16). In his Motion, Mr. McCloud alleges that Florence, Kentucky police officers lacked probable cause to arrest him and that all evidence seized thereafter should be suppressed. (Doc. # 16 at 3).

On September 19, 2018, the Court held an evidentiary hearing on the Motion. (Doc. # 19). Defendant McCloud was present at the hearing and represented by attorney Steven Howe. The United States was represented by Assistant United States Attorney Anthony Bracke. The hearing was recorded by the Official Court Reporter Lisa Wiesman (Doc. # 21). Prior to the hearing, the Defendant filed a memorandum in support of his Motion to Suppress (Doc. # 16) and the United States filed a Response in Opposition (Doc. # 17). The deadline for Defendant's reply brief having expired, the Motion is now ripe for the Court's review. For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 16) is hereby **denied**.

## II. FINDINGS OF FACT

Two witnesses testified during the evidentiary hearing on behalf of the United States: Florence, Kentucky Police Officer Marc Richardson and DEA Supervisor Special Agent Brian Stine. The Defendant called no witnesses. Weighing the credibility of the witnesses, the Court makes the following factual findings:

1. In the late afternoon on February 20, 2018, Florence, Kentucky Police Officer Marc Richardson arrived at a hotel room on Houston Road in Florence as part of an undercover operation to apprehend a woman who had solicited as a prostitute on Craigslist. (Doc. # 21 at 7:23-8:4; 23:2-9; 29:5-8). When Officer Richardson arrived at the hotel room, he found two women present, both of whom offered sex in exchange for money. (Doc. # 21 at 7:22-8:3). While Officer Richardson was citing the women with prostitution, Florence, Kentucky Police Sergeant Reed arrived on the scene. (Doc. # 21 at 8:5).

2. While one of the women was pulling out her ID, Sergeant Reed observed what he thought was methamphetamine in her purse. (Doc. # 21 at 8:5-7). The officers then proceeded to search the entire room, finding additional methamphetamine. (Doc. # 21 at 8:8-9). The women agreed to give the officers the identity of their methamphetamine supplier. (Doc. # 21 at 8:10-13).

3. At the police officers' request, the women arranged to purchase additional narcotics from their supplier and have the drugs delivered to their hotel room with the officers present. (Doc. # 21 at 8:10-16). The women set up the purchase and their supplier [hereinafter the "Informant"] arrived with the requested drugs. (Doc. # 21 at 8:17-

23). Shortly thereafter, officers detained the Informant. (Doc. # 21 at 8:14-16).

4. Upon his detention by the police, the Informant told Officer Richardson that he would arrange a purchase of methamphetamine through his supplier, who went by the initials "S.P." (Doc. # 21 at 9:17-20). Specifically, the Informant stated that he could obtain five ounces of methamphetamine for $2,500 from S.P. that evening. (Doc. # 21 at 9:20-21). The Informant described S.P. as a "skinny black male," who drove a dark blue, four-door vehicle with tinted windows and who always carried a firearm. (Doc. # 21 at 9:22-10:4; 10:16-19).

5. After the Informant indicated that he was interested in cooperating, the police officers took the Informant to the Florence, Kentucky police station to conduct an interview. (Doc. # 21 at 12:10-12). Prior to the interview, Officer Richardson checked the Informant's criminal history and had the Informant sign a cooperation agreement. (Doc. # 21 at 30:12-20). During the interview, the Informant agreed to arrange a drug purchase with S.P. by phone, to occur very early the next morning. (Doc. # 21 at 12:14-19).

6. At 11:45 p.m., the Informant called S.P., who was already saved as a contact in the Informant's phone. (Doc. # 21 at 12:14-19; 41:17-42:6). During the phone call, which was recorded, the Informant told S.P. that "he needed five," meaning five ounces of methamphetamine. (Doc. # 21 at 12:16-13:6). S.P. agreed. (Doc. # 21 at 12:16-17). During either the same phone call or during a subsequent call, the Informant also asked S.P. to bring him two grams of "boy" (the street name for heroin). (Doc. # 21 at 14:2-8). S.P. also agreed to this request. (Doc. # 21 at 14:9-10). The Informant told Officer Richardson that the transaction with S.P. would take place in his hotel room at the

Days Inn on Cavalier Drive, where the Informant had been staying. (Doc. # 21 at 10:19-11:14; 14:20-15:5).

7. After the Informant made the initial phone call to S.P., Officers Richardson and Samad as well as Sergeant Reed escorted the Informant to his hotel room on the second floor of the Days Inn. (Doc. # 21 at 14:12-13; 20:14-17). Sergeant Reed was communicating with Drug Enforcement Agency ("DEA") agents stationed in the parking lot, one of whom was Supervising Agent Brian Stine. (Doc. # 21 at 28:12-24).

8. Prior to arriving at the hotel room, the Informant notified Officer Richardson that there were illegal drugs in his hotel room and told police officers exactly where the drugs were located within the room. (Doc. # 21 at 14:13-16; 15:6-21). The Informant consented to a full search of the hotel room and all drugs found were seized. (Doc. # 21 at 14:14-18). Officer Richardson testified that the Informant's identification of the location of the drugs was accurate and that no drugs were found in addition to the ones that the Informant had identified. (Doc. # 21 at 15:22-16:2).

9. While in the hotel room, the Informant made four additional phone calls to S.P. (Doc. # 21 at 34:17-19). These calls were made in an attempt to determine when S.P. would arrive at the hotel. (Doc. # 21 at 13:11-16).

10. In addition to identifying S.P.'s car as a dark blue four-door with tinted windows, the Informant stated that S.P. would back up his car into a particular parking spot near the pool and an adjacent grassy area, with the front end of his car facing the hotel. (Doc. # 21 at 11:15-24). The Informant also told Officer Richardson that S.P. may be arriving with his brother. (Doc. # 21 at 11:25-12-7). Agent Stine testified that he was

4

told that the car would be a Ford Taurus. (Doc. # 21 at 44:23-45:6). This fact turned out not to be true. (Doc. # 21 at 60:19-20).

11. At approximately 1:15 a.m. on February 21, 2018, DEA agents radioed that a dark blue car with tinted windows had arrived at the Days Inn parking lot. (Doc. # 21 at 16:24-25; 18:3-7). The car was parked as the Informant had indicated it would be. (Doc. # 21 at 18:8-9; 19-1-2). The Informant also looked out of the hotel room window and identified the vehicle as belonging to S.P. (Doc. # 21 at 18:10-11).

12. Agent Stine observed an individual matching S.P.'s description exit the car while talking on his cell phone. (Doc. # 21 at 46:5-10). Agent Stine also observed a second individual who remained in the car. (Doc. # 21 at 46:3-6). The individual who stayed in the car was later determined to be S.P.'s brother. (Doc. # 21 at 46:21-24). Agent Stine continued to observe the individual until he got to the stairs leading up to the second-floor balcony, which was obscured by a wall. (Doc. # 21 at 19:8-12; 33:22-25; 53:1-7). About a minute after the individual entered the stairwell, DEA agents observed the same individual walking across the hotel breezeway. (Doc. # 21 at 33:22-34:14; 53:1-7).

13. After walking across the breezeway, the individual fitting the description of S.P. knocked on the Informant's door. (Doc. # 21 at 20:11-13). Either Officer Samad or the Informant opened the door, after which Officer Richardson yelled "police." (Doc. # 21 at 20:18-19). Upon hearing and seeing Officer Richardson, the individual said, "oh, fuck," turned around, threw his phone down, and attempted to run down the breezeway. (Doc. # 21 at 20:23-21:1; 47:17-21). In response, Officer Richardson chased after the

individual, grabbing hold of his clothes, tackling him, and laying on top of him until the individual was handcuffed. (Doc. # 21 at 21:2-8). The individual was later identified as Mr. McCloud. (Doc. # 21 at 25:20-22).

14. After handcuffing Mr. McCloud and sitting him upright, Officer Richardson noticed baggies containing what appeared to be methamphetamine hanging out of his pants pockets. (Doc. # 21 at 21:12-14). The baggies were seized and later confirmed to contain methamphetamine in an amount consistent with what had been negotiated between the Informant and S.P. (Doc. # 21 at 41:6-8).

## III. ANALYSIS

The sole issue to be decided is whether Florence, Kentucky police officers had probable cause to arrest Mr. McCloud based on information from a confidential informant and subsequent police investigation. Finding that the Informant was reliable and that his tip to police was detailed and substantially corroborated, the Court finds that officers had sufficient probable cause to arrest Mr. McCloud. Accordingly, Defendant's motion to suppress is **denied**.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Warrantless arrests are permissible "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *accord Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

There is no "precise formula" for assessing probable cause. *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Rather, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "While probable cause means that 'officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.'" *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *Strickland*, 144 F.3d at 416).

Under Sixth Circuit law, it is well-established that a confidential informant's tips to law enforcement—when shown to be substantially corroborated—are sufficient to establish probable cause. *Strickland*, 144 F.3d at 417. Specifically, the Sixth Circuit has repeatedly held that probable cause exists when an informant describes the details of a drug transaction that is to take place in the future, and those details are then independently observed by police officers. *See United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012); *Strickland*, 144 F.3d at 417; *United States v. Barrett*, 890 F.2d 855, 861-62 (6th Cir. 1989). "The more unusual the occurrences are that the police are able to confirm, the stronger the showing of probable cause, and vice versa." *Strickland*, 144 F.3d at 417.

7

Other factors are relevant to evaluating the reliability of the informant, including whether the informant made statements against his/her own penal interest, and how well the informant can show that he knows the identity of the suspect. *See United States v. Dickens*, No. 17-5721, 2018 WL 4203481, at *4 (6th Cir. Sept. 4, 2018) (citing *United States v. Harris*, 403 U.S. 573, 583 (1971)).

In addition, a suspect's own behavior, such as fleeing from the police, can contribute to a finding of probable cause. *United States v. Hughes*, 898 F.2d 63, 64 (6th Cir. 1990). Finally, there is no requirement that officers witness an illegal event taking place before probable cause exists. *Strickland*, 144 F.3d at 417. Therefore, officers need not observe a completed drug transaction before lawfully arresting a suspected drug dealer. *Gill*, 685 F.3d at 610.

In *Strickland*, police detectives arranged a controlled drug deal through a confidential informant named Haggard. 144 F.3d at 414. The informant called the defendant Strickland in the presence of police officers and agreed to purchase one ounce of cocaine from Strickland in the parking lot of a convenience store at 7:30 that evening. *Id.* Haggard reported to police that in past drug deals with Strickland, the two would meet in Haggard's car, chat for a few minutes, and then exchange money for drugs. *Id.* After witnessing Strickland arrive at the convenience store parking lot, enter Haggard's vehicle, and exit after several minutes, police arrested Strickland. *Id.* A search incident to arrest indicated that Haggard had exchanged the marked currency given to him by police for the one ounce of cocaine from Strickland. *Id.* The court found that there was probable cause to arrest Strickland despite the fact that police had not witnessed the actual drug

8

transaction because the events that took place substantially matched the description given to them previously by the informant. *Id.* at 417.

Similarly in *Gill*, William Holmes agreed to become a confidential informant after being arrested for possession and sale of narcotics. 685 F.3d at 608. In the presence of police officers, Holmes called his supplier, Gill, who agreed to sell five ounces of cocaine to Holmes at a particular location on Vine Street in Cincinnati. *Id.* Holmes told police that Gill would be driving a green Acura. *Id.* True to Holmes's prediction, Gill arrived at the specified location on Vine Street in a green Acura. *Id.* He then exited the car and joined a group of individuals in front of a house alongside the street. *Id.* When police announced their presence, Gill fled on foot down the street, until he eventually stopped and surrendered to police. *Id.* A subsequent search of Gill's car revealed the five ounces of cocaine Holmes had requested on the phone. *Id.* Like in *Strickland*, the Sixth Circuit determined there was probable cause, as police were able to corroborate Holmes's tip regarding the color and make of Gill's car as well as the time and location of the drug transaction. *Id.* at 610.

In this case, the series of events leading up to Mr. McCloud's arrest at the Days Inn is sufficient to establish probable cause that Mr. McCloud was about to commit a crime. Like in *Strickland* and *Gill*, the Informant was able to arrange a drug deal in front of police and provided numerous details regarding how the deal would unfold—many of which police were able to corroborate. These included:

(1) The color, size, and other characteristics of Defendant's car;

(2) The general time that the transaction was to take place;

(3) The location of the transaction;

(4) The location and manner in which McCloud would park his car at the Days Inn;

(5) The fact that another individual (Mr. McCloud's brother) might accompany Mr. McCloud to the drug deal.

(Doc. # 21 at 16:14-25; 18:6-25; 19:1-2; 45:9-47:10).

In addition to providing a detailed tip that was substantially corroborated, the Informant bolstered his credibility by demonstrating considerable knowledge of the Defendant's identity as well as a familiarity with his *modus operandi*. First, the Informant's corroborated tip regarding Mr. McCloud's car, including where and how he would park it, suggested that the Informant and the Defendant had met on prior occasions. (Doc. # 21 at 45:9-25). Second, the Informant already had Mr. McCloud's phone number saved as a contact in his cell phone under the alias "S.P." (Doc. # 21 at 41:17-20). Third, the Informant was familiar with Mr. McCloud's vernacular and the types of drugs he sold, stating on the phone to Mr. McCloud that "he needed five," which implied five ounces of methamphetamine, and two grams of "boy," which is the street name for heroin. (Doc. # 21 at 12:16-17; 13:25-14:10).

Other factors weigh in favor of a probable cause determination in this case. The Informant's decision to tell law enforcement that there were drugs in his hotel room constituted a statement against penal interest, which increased his reliability as an informant. (Doc. # 21 at 14:13-16; 15:6-21); *see Dickens*, 2018 WL 4203481, at *4. Mr. McCloud's attempt to flee after being confronted by police is also significant evidence that he was in the process of committing a crime. (Doc. # 21 at 20:25-21:1; 41:2-3); *see Hughes*, 898 F.2d at 64.

Defendant makes four main arguments as to why officers did not have probable cause to arrest Mr. McCloud. First, Defendant claims that "[t]he informant's description of 'SP' is most analogous to an anonymous tip," which is given much less weight in the probable cause analysis. (Doc. # 16 at 4). Second, Defendant contends that under *Florida v. J.L.*, 529 U.S. 266 (2000), the physical description of Mr. McCloud given by the Informant was far too generic for a finding of probable cause. *Id.* at 4. Third, McCloud argues, the Informant's statements to the police were unreliable because the Informant was unable to identify Mr. McCloud by his real name. *Id.* at 4. Fourth, Defendant asserted at the evidentiary hearing that because the Informant was wrong about the make and model of Mr. McCloud's car, the Informant's tip was not substantially corroborated and thus insufficient for a finding of probable cause. (Doc. # 21 at 57:5-8).

Defendant's first argument is unpersuasive. While it may be true that the Florence, Kentucky police had not previously interacted with the Informant (Doc. # 21 at 29:9-18), the Informant's tip was far from anonymous. In fact, the Informant in this case was known to the officers by name and officers interacted with him in-person, conducting a thorough interview and reviewing the Informant's criminal history. (Doc. # 21 at 30:8-20). This is in stark contrast to the facts in *Florida v. J.L.*—cited by Defendant (Doc. # 16 at 4)—in which there was "no audio recording of the tip, and nothing [was] known about the informant." 529 U.S. 266, 268 (2000).

Defendant's second and third arguments also lack merit. Although the Informant was unaware of Mr. McCloud's real name and was only able to describe Mr. McCloud as a "skinny black male," (Doc. # 21 at 31:15-18; 32:19-21), the identity of a suspect is only

11

one of many potential facts that—if corroborated—create a "reasonable probability that illegality has occurred or is about to occur." *Strickland*, 144 F.3d at 415; *accord Gill*, 685 F.3d at 610. Indeed, the Sixth Circuit has found probable cause in cases where a confidential informant is only able to identify the suspect by his nickname. *United States v. Harris*, 255 F.3d 288, 290 (6th Cir. 2001); *United States v. Allen*, 211 F.3d 970, 971 (6th Cir. 2000) (en banc). In addition to providing Mr. McCloud's alias and a generic physical description, the Informant in this case also provided several other details that could be independently verified by law enforcement officials, including the description of the car Mr. McCloud drove, the location of the drug deal, the manner in which Mr. McCloud would park his car, and the potential presence of Mr. McCloud's brother. *See supra* at 9-10. The Informant's detailed and corroborated tip, along with the fact that it was not anonymous, is more than sufficient to distinguish this case from *J.L.*, where the anonymous tipster merely described a black male wearing a plaid shirt who was located at a particular bus stop. 529 U.S. at 268.

Finally, as Mr. McCloud pointed out at the evidentiary hearing, Agent Stine was expecting Mr. McCloud to be driving a Ford Taurus, which turned out not to be the case. (Doc. # 21 at 45:1-6; 57:5-8; 60:19-20). Nevertheless, this fact alone is not sufficient to negate a finding of probable cause, as the law requires *substantial*, not perfect, corroboration. *See Strickland*, 144 F.3d at 412 ("[T]he corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect."); *Gill*, 685 F.3d at 610.

No case better illustrates this rule than *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court opinion establishing the modern standard for judging probable cause under the Fourth Amendment. In *Gates*, "the anonymous informant had not been completely accurate in his or her predictions." 462 U.S. at 291 (Stevens, J., dissenting). Even so, the Court found that there was probable cause, as police had shown "corroboration of major portions of the letter's predictions." *Gates*, 462 U.S. at 246.

Therefore, the Florence, Kentucky police officers' inability to corroborate one hundred percent of the Informant's tip does not preclude a finding of probable cause. The fact remains that the Informant's general description of the vehicle was otherwise correct (the color, tinted windows, and number of doors). *Supra* at 9-10. Additionally, the overall tip contained many other corroborated details, some of which were not easily predictable, including the exact nature in which Mr. McCloud would park his car at the Days Inn. *See supra* at 9-10.

In summary, when considering the Informant's detailed knowledge of the Defendant's business practices, his admissions against penal interest, the fact that the alias "S.P." was already listed as a contact in the Informant's phone, the recorded telephone calls during which the drug deal was set up, the Informant's substantially accurate predictions of Defendant's movements on the night of the arrest, and Mr. McCloud's attempt to flee, the Court finds that the officers had probable cause to arrest Mr. McCloud.

IV.   **CONCLUSION**

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)   Defendant's Motion to Suppress (Doc. # 16) is **DENIED**;

(2)   The time period between August 27, 2018 and the date of the entry of this Order, totaling fifty-one (51) days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D) & (H); and

(3)   This matter is scheduled for a **Status Conference** on **Friday, October 19, 2018 at 10:00 a.m. in Covington** at which time the Court will set this matter for trial.

This 17th day of October, 2018.



Signed By:
*David L. Bunning*   DB
United States District Judge

J:\DATA\ORDERS\Covington Criminal\2018\18-23 MOO Denying MTS.docx

14